U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED - SHREVEPORT

SEP 16 2008

ROBERT H. SHEMWELL, CLERK
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF LOUISIANA
# SHREVEPORT DIVISION

GARY PLANCHER

versus

TRIDENT HEALTH RESOURCES, INC.

CIVIL ACTION NO. 06-0559
JUDGE TOM STAGG

## MEMORANDUM RULING

Before the court is a motion for summary judgment filed by the defendant, Trident Health Resources, Inc. ("Trident"), seeking dismissal of all of the claims of plaintiff, Gary Plancher ("Plancher"). See Record Document 16. For the reasons set forth below, the defendant's motion for summary judgment is **GRANTED**.

## I. BACKGROUND

Plancher, a black male, was employed by Trident in May of 2003 as a staff perfusionist[1] for the Willis Knighton hospitals in Shreveport, Louisiana. Because of the nature of the job responsibilities, perfusionists are required to immediately respond to phone calls and pages when on call, arrive at the hospital within thirty minutes of a call or page, and remain in the operating room or be immediately

---

[1] A perfusionist operates extracorporeal circulation equipment during any medical procedure in which it is necessary to artificially support or temporarily replace a patient's circulatory or respiratory functions, such as in open heart surgery or other heart procedures, liver and lung transplants.

available at the hospital until an operation is completed. Thereafter, a perfusionist is required to clean the machinery and properly dispose of any products that have come into contact with blood in accordance with hazardous waste regulations.

During Plancher's first year with Trident, there were no concerns about his job performance. However, on or about September 15, 2004, an incident involving Plancher was reported to Trident's President, Ralph Jordan ("Jordan"), by one of the senior traveling perfusionists, Dean Kossol ("Kossol").[2] Specifically, Jordan was informed that Plancher was late for an operation that occurred on September 11, 2004. In response to a request by Jordan, Kossol forwarded to Jordan an e-mail describing the incident:

> On Tuesday, (9/14/04) while working at Willis-Knighten [sic] Bossier, I was approached by Linda the [operating room] control desk nurse. She told me that she was asked by Peggy Richardson, a manager at Bossier, to ask me who had the perfusion contract at Willis-Knighten [sic], and how she could view it. I told her that Trident had the contract and it should be on file with administration. Nothing else was mentioned.
>
> Later that evening, while learning the next day's schedule, I asked Melanie Canatella if she knew of a reason why Peggy would be interested in our contract. She informed me of an incident that occurred on Saturday, (9/11/04)

---

[2]Because Trident's operations are so widespread, Trident relies upon the Chief Perfusionist at each hospital and traveling perfusionists (who assist on an as-needed basis to provide support) to provide feedback about performance issues with other staff perfusionists.

2

> involving Gary Plancher. Dr. Slocum had scheduled an emergent [abdominal aortic aneurysm]. As per this writing, I am uncertain of the exact time it was placed on the schedule. Melanie then told me that Mary Fenelli was called around 2:50 pm. Mary explained that she was out sick the few days prior, and that Gary was the on-call person, and had they tried to reach him. She was told that he was paged numerous times, and that he never responded back. While Mary was on the phone with Bossier, Gary called back and said he was on his way there. So Mary did not respond, understanding Gary was on his way. Mary receives another call from Mindy Frentress, the circulating nurse at Bossier, around 4:15 pm, hysterically stating that Gary had not yet arrived and ask[ed] her to please go to the hospital because the cardiotomy reservoir was overflowing. While Mary was on the phone with the hospital, Gary called from the dressing room stating he was there. He then became verbally abusive to the nursing staff.

Record Document 16, Ex. P-15 (Attached To Declaration Of Bailey). Jordan forwarded the e-mail to Trident's Vice-President, Ron Bailey ("Bailey"). Bailey spoke with the three perfusionists who reported the incident (Kossol, Canatella and Fenelli) and they all confirmed that the incident had occurred. Bailey also checked with Chief Perfusionist of the Willis Knighton hospitals, Kevin Connor ("Connor"), about the incident. Connor was not aware of the events of that day but Bailey asked Connor to speak to Plancher about it. Connor spoke to Plancher, who responded that he was only a few minutes late for the procedure. Connor then informed Bailey of Plancher's response. Thereafter, Bailey called Plancher and spoke to him about the importance of taking on-call assignments seriously. Plancher continued to assert that

he was not very late and seemed to Bailey to be nonchalant about the matter.

Another incident involving Plancher occurred on November 10, 2004, when he was assigned to provide the perfusion services for a liver transplant operation. Plancher allegedly left the hospital in the middle of the operation, three hours before it was completed. Heidi Doffing ("Doffing"), a traveling perfusionist who was helping at Willis Knighton that day, called Bailey to report this conduct. Thereafter, Doffing emailed Bailey:

> I was doing a [Dr.] Srivyas [coronary artery bypass graft] and Gary was doing a liver. Both patients came into the room at 7:30. Gary went on pump before I did, but not by much. Gary came into my room at 11:30 to ask me to "watch his room, they were almost finished." I told him I was still going to be on bypass for another hour and I wouldn't be able to help that room in case they needed anything. He said, "They won't, there is not blood to process and they are closing." He told me the machine was in automatic mode which means the machine will automatically process the blood if there becomes enough. He left. I was on bypass until 12:28, when the nurse in Gary's room came in and asked me where he was. I said he left, what can I do for you? I asked Dr. Srivyas if I could run down to the other room and check it out. They had 1600cc of blood in the cellsaver, the cellsaver was OFF, and the suction tip was on the floor. Anesthesia wanted to know if I could process that blood. I told them no due to the fact the cellsaver tip was on the floor, deeming the collected blood contaminated.
>
> At this point I returned to my room because I suspected my patient needed me to transfuse some volume, I was correct. I left the cellsaver set up in the liver room, informed the

4

surgeon they could use it for suction, but the blood was unusable.

I finished my case, gave the other room my pager number just in case the [sic] got into bleeding trouble later. Upon completion of my case I removed the cellsaver from the liver room, which was about 2:25 pm. Then I went back [and] transferred my patient to the ICU and set up the pump.

I was informed later, since I was on call that day, it was Gary's day to stay late regardless of which case he did. He should have relieved me upon completion of his case, so that I could go relieve someone else. I was uninformed as to "why" Gary needed to leave early until the next day. During my case I was in no position to judge if his case was done or not, clearly not, which obviously would have affected my decision to let him leave.

Overall, I felt as if I was put in a position I would never clinically put anyone else in. Patient care "was" jeopardized do [sic] to the fact that is our job to collect and process salvaged blood. If we could have processed the blood in the liver room before the tip hit the floor we could have prevented further blood transfusions for that patient. If the case was truly almost done as I was told, then Gary should have asked the surgeon if he was through, disassembled the cellsaver, and then asked me if it was alright if he left because his patient was still in the room.

Record Document 16, Ex. 2 (Attached To Declaration Of Bailey).

After hearing about Plancher's conduct of November 10 and concluding that Plancher had a nonchalant attitude towards behavior that Trident considered unacceptable, Bailey concluded that the company could not rely upon Plancher to perform his professional duties and decided to terminate his employment. Plancher

5

filed this action against Trident, asserting that he was terminated because of his race.³

## II. ANALYSIS

### A. Summary Judgment Standard.

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Stahl v. Novartis Pharm. Corp., 283 F.3d 254, 263 (5th Cir. 2002). If the movant demonstrates the absence of a genuine issue of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 141 (5th Cir. 2004) (citations and quotations omitted). Where critical

---

³Plancher also filed claims under the Louisiana Discrimination statutes, La. R.S. 23:332, et seq. and La. R.S. 51:2264, et seq., but these claims are **DISMISSED** because Trident does not meet the jurisdictional requirements for coverage under La. R.S. 23:332 et seq. and there is no cause of action for race discrimination under La. R.S. 51:2264, et seq.

evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, then summary judgment should be granted. See Boudreaux v. Swift Transp. Co. Inc., 402 F.3d 536, 540 (5th Cir. 2005). "[T]he nonmovant cannot satisfy [his] burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." Freeman v. Tex. Dep't of Criminal Justice, 369 F.3d 854, 860 (5th Cir. 2004).

### C. Race Discrimination.

Plancher alleges that Trident discriminated against him because of his race by discharging him. Title VII provides that "[i]t shall be an unlawful employment practice for an employer--(1) to fail or refuse to hire or to discharge any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may prove employment discrimination through direct or circumstantial evidence. See Laxton v. Gap Inc., 333 F.3d 572, 578 (5th Cir. 2003). As there is no direct evidence of discrimination in this case, Plancher's claims are evaluated using the clear evidentiary framework set forth by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973). Under this analysis, if Plancher establishes a prima facie case of discrimination, the burden shifts to Trident to articulate a legitimate, non-discriminatory reason for terminating him. See id. at 802-03, 93 S. Ct. at 1825.

If Trident meets its burden, Plancher then bears the ultimate burden of proving that Trident's proffered reason is not true but instead is a pretext for the real discriminatory purpose. See id. To carry this burden, Plancher must rebut each nondiscriminatory reason articulated by Trident. See Laxton, 333 F.3d at 578 (citation omitted). Plancher can establish pretext by "showing that [Trident's] proffered explanation is false or 'unworthy of credence.'" Id. (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143, 120 S. Ct. 2097 (2000)). At the summary judgment stage, the question is not whether Plancher has proven pretext, but rather whether he has raised a genuine issue of fact with respect to pretext. See Hall v. Gillman Inc., 81 F.3d 35, 37 (5th Cir. 1996).

This court will assume, without deciding, that a prima facie case exists and will, therefore, proceed to the next step of the McDonnell Douglas analysis. Thus, the burden of production is shifted to Trident to proffer a legitimate, non-discriminatory reason for the challenged employment action.

Trident has satisfied its burden of producing a legitimate, non-discriminatory reason for terminating Plancher. Its burden in this regard "is one of production, not persuasion . . . [and] can involve no credibility assessment." Russell v. McKinney Hosp. Venture, 235 F.3d 219, 222 (5th Cir. 2000) (citation omitted). In support of its motion for summary judgment, Trident produced the declaration of its Vice-President,

8

Bailey. See Record Document 16, Declaration of Bailey. In that declaration, Bailey, who is responsible for hiring, disciplining and terminating employees, plainly states that "because of the seriousness of the incidents [involving Plancher] and Mr. Plancher's unwillingness to acknowledge the seriousness of his conduct," he recommended to the President of Trident that Plancher's employment be terminated. Id., Declaration of Bailey at 9. Bailey explained that he was "concerned about retaining [Plancher] as a perfusionist" and that Plancher's conduct was

> in direct violation of the corporate goals and his individual goals to make patient quality of care our highest priority and to provide rapid response to all situations and requests for assistance [] and our corporate mission statement that our primary purpose is the care of patients [], policies which were attached to his employment contract [] and which he had committed to follow.

Id., Declaration of Bailey at 8. The declaration and its accompanying attachments, including the e-mails documenting the concerns about Plancher, unequivocally provide legitimate, non-discriminatory reasons for terminating Plancher.

The foregoing evidence proffered by Trident satisfies its burden. Accordingly, the presumption of unlawful discrimination disappears, and the burden shifts back to Plancher to prove that the proffered reasons are a pretext for discrimination. The ultimate determination in the summary judgment context is whether, viewing all of the evidence in a light most favorable to the plaintiff, a reasonable factfinder could

infer discrimination. See Crawford v. Formosa Plastics Corp., 234 F.3d 899 (5th Cir. 2000); Reeves, 530 U.S. at 142-43, 120 S. Ct. at 2106. In making this determination, a court should consider "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case. . . ." Crawford, 234 F.3d at 902 (quoting Reeves, 530 U.S. at 146, 120 S. Ct. at 2108). The Fifth Circuit Court of Appeals has recognized the difficulty in proving discrimination by direct evidence. See LaPierre v. Benson Nissan, Inc., 86 F.3d 444, 449 (5th Cir. 1996). Thus, the strength of the circumstantial evidence supporting the plaintiff's prima facie case and showing the defendant's proffered reason is false may be enough to create an inference of discrimination. See Crawford, 234 F.3d at 902; Reeves, 530 U.S. 133, 120 S. Ct. at 2109.

A mere scintilla of evidence of pretext does not create an issue of material fact in all cases. See Crawford, 234 F.3d at 902; Wyvill v. United Cos. Life Ins. Co., 212 F.3d 296, 301 (5th Cir. 2000). The plaintiff must present "sufficient evidence to find that the employer's asserted justification is false." Crawford, 234 F.3d at 903 (quoting Reeves, 530 U.S. 133, 120 S. Ct. at 2109). The determination is to be made on a case-by-case basis, depending on the nature, extent, and quality of the evidence, as to whether a jury could reasonably infer discrimination.

Plancher has presented insufficient evidence of pretext to support a reasonable

inference of discrimination on the basis of race in this case, and has failed to demonstrate a genuine issue of material fact as to whether the defendant's employment action was illegally motivated. First, Plancher contends that the summary judgment evidence as to the liver transplant incident of November 10 is contradictory. Plancher denies that he left the premises before the operation was complete or that he abandoned the patient before his duties were complete. Trident, however, accurately responds that the only issue before the court is whether Plancher has offered any evidence as to whether the decisionmakers truly believed the complaints about Plancher's job performance. Plancher has offered no evidence that Bailey, Jordan or Canatella did not believe Doffing's account of what happened on November 10. Plancher instead simply denies that the incident of November 10 happened, citing his own affidavit, an affidavit from Dr. McMillan (the doctor involved in the procedure at issue), deposition testimony from Canatella about her inquiries regarding the incident (which failed to result in anyone remembering the incident), the lack of a formal complaint from Willis Knighton, and the fact that the perfusionist record did not show that Doffing assisted on the operation. However, none of these items address whether Bailey, Jordan and Canatella believed Doffing's version of what occurred on that date.

Plancher next admits that he was late on September 11, 2004; however, he

asserts that this was the only occasion he was late and that it was due to a misunderstanding between Plancher and the nurse who paged him. Regardless of Plancher's reason for his tardiness, the fact remains that he was late and that the incident was reported to management. Plancher counters that Connor, the Chief Perfusionist who was a white male, was repeatedly late. He further contends that perfusionist Shelby Phelan ("Phelan"), a white female, habitually missed assignments. However, the case law is well-settled that to succeed under a theory of disparate treatment, Plancher must prove that his circumstances were "nearly identical" to the circumstances of Connor or Phelan. See Berquist v. Washington Mut. Bank, 500 F.3d 344, 353 (5th Cir. 2007). This, Plancher clearly has not done. Furthermore, Plancher's tardiness was only *one* of the reasons for his termination. For example, not only was management informed that Plancher was late but they were also told that Plancher cursed at the nurses when he did finally arrive.[4]

Plancher next argues that Trident did not follow its own policies and procedures in terminating him. Trident's policies provide for three steps in the disciplinary action

---

[4]Plancher also argues that the Trident Handbook lists *excessive* absenteeism or tardiness as grounds for dismissal. He thus concludes that Trident does not apply its policies evenly. However, the court again notes that tardiness was not the *only* reason for Plancher's termination and that Plancher has not produced any evidence that white employees were treated more favorably in this regard.

procedure.⁵ There is a dispute in the evidence regarding whether Plancher was verbally warned about any performance issues. There is also an evidentiary dispute as to whether a written warning was provided to Plancher.⁶ Bailey, however, asserts that Trident did not follow established protocol because of the seriousness of the situation involving Plancher. Plancher counters that Trident waited to terminate him until five months after the first incident and three months after the second incident. Therefore, Plancher contends that the summary judgment evidence undermines the overall credibility of Trident's proffered justification.

Plancher may take issue with the procedure used in his termination, but his disagreement with the process does not create a genuine issue of material fact with regard to whether Trident acted with discriminatory intent. When management was informed of the first incident involving Plancher, both Jordan and Bailey spoke to Plancher about it and expressed displeasure. When the second incident occurred,

---

⁵Plancher also asserts that Trident did not comply with its contractual obligation to provide him written notice of termination. Although Trident asserts that it did provide written notice, there is no proof in the record of written notice and Trident cannot produce such. In addition, Plancher points out that he was paid severance benefits, contrary to his employment contract, which he contends is inconsistent with Trident's claim that he was guilty of egregious misconduct. However, these arguments simply do not establish disparate treatment or discriminatory intent.

⁶The court does note that Plancher's personnel file does not contain any written warnings or derogatory remarks regarding Plancher, or a copy of any of the emails now relied upon by Trident to support Plancher's termination.
13

management investigated the matter and proceeded to search for a replacement. Thus, contrary to Plancher's assertions, the process surrounding his termination does not merit a conclusion that Trident acted with discriminatory intent.

As in this case, where there is no direct evidence of discrimination, Plancher needed to present sufficient evidence that the defendant's proffered reasons were false to overcome the defendant's assertions. However, Plancher has offered no proof that anything other than a perception by management of unsatisfactory job performance motivated his termination. He has brought forth nothing but conclusory allegations to show that his termination was based upon any reason other than the ones articulated by the defendant, and this is clearly not sufficient to defeat the defendant's motion for summary judgment. See Bynam v. FMC Corp., 770 F.2d 556, 576 (5th Cir. 1985); Richardson v. Oldham, 12 F.3d 1373, 1378 (5th Cir. 1994) (holding that "[m]ere conclusory allegations are not competent summary judgment evidence . . . .").

Plancher has put forth absolutely no evidence to demonstrate that Trident's reasons were false or were a pretext for discrimination. In order to survive summary judgment, Plancher must demonstrate that Trident acted with discriminatory intent. See Mayberry v. Vought Aircraft Co., 55 F.3d 1086, 1091 (1995). This he has not done. Title VII does not protect an employee against unfair employment decisions. Instead, it protects against employment decisions based upon discriminatory animus.

See Nieto v. L & H Packing Co., 108 F.3d 621, 624 (5th Cir. 1997). After investigating the incidents involving Plancher, Trident's management concluded that Plancher's conduct was not consistent with company policies. Trident can make an employment decision that may be perceived by some as incorrect, but if that decision is based upon a good faith belief with no discriminatory influences, as happened with the decision to terminate Plancher, then the court will not question the validity of the reasons. See Mayberry, 55 F.3d at 1091. The complaints set out in the e-mails were the basic source of this employment action. They were solely based on employee attitude, not race. Plancher has provided no evidence that the decision to terminate him was motivated by race.

### III. CONCLUSION

Viewing all of the summary judgment evidence in a light most favorable to Plancher, the court holds that no reasonable factfinder could infer race discrimination from the evidence set forth in this case. Accordingly, the defendant's motion for summary judgment is **GRANTED**. All of Plancher's claims against Trident are **DISMISSED WITH PREJUDICE.**

A judgment consistent with the terms of this Memorandum Ruling shall issue herewith.

**THUS DATED AND SIGNED** at Shreveport, Louisiana, this 16th day of September, 2008.

JUDGE TOM STAGG

15